**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John A. GARCIA et al., Defendants-
Appellants.**

**CITY OF AUSTIN et al., Plaintiffs-
Appellees,**

v.

**John A. GARCIA et al., Defendants-
Appellants.**

No. 72-2823
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

March 12, 1973.

Rehearing Denied May 10, 1973.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I.

John A. Garcia, M.D., pro se.

William S. Sessions, U. S. Atty., Henry Valdespino, Asst. U. S. Atty., San Antonio, Tex., Winfred O. Craft, Asst. City Atty., Paul Jones, Austin, Tex., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., Dept. of Justice, Washington, D. C., for plaintiffs-appellees.

Before JOHN R. BROWN, Chief Judge, and DYER and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The Garcias, defendants-appellants,[1] are judgment debtors to plaintiff-appellee, the United States. On this appeal they object to their having been required—in order to satisfy their outstanding judgment—to sell realty at a private sale to the Urban Renewal Agency of Austin, Texas, for a price they contend to be a mere fraction of its true value had the property been placed on the open and free market. Much of the confusion below and on this appeal arises from the fact that Dr. Garcia, a physician, is proceeding pro se in a field that would be troublesome for most attorneys. He is as clearly bewildered as an attorney would be attempting a complex surgical operation. We find no error in the manner by which the district court disposed of the appellants' debt and property. Accordingly we affirm.

On January 20, 1970, this court affirmed a judgment in favor of the United States for unpaid income tax liabilities of the Taxpayer for the years 1954 through 1956 and 1958 through 1961. Garcia v. United States, 5 Cir. 1970, 421 F.2d 1231, cert. denied, 400 U.S. 945, 91 S.Ct. 251, 27 L.Ed.2d 251. Certain payments were subsequently credited toward the Taxpayer's delinquent tax account but, according to the Internal Revenue Service, more than $61,000, with interest accruing daily, remained unpaid by October 1971. On October 15, 1971, the district court granted the Government's request for the public sale of four parcels of land owned by John A.

---

1. We refer throughout this opinion to John A. Garcia as the Taxpayer. The appellant Mary Sue Garcia is also a party because she signed joint tax returns with her husband for the taxable years involved.

Garcia, of which three were located in Austin, Travis County, Texas, and the fourth was situated in Houston, Harris County, Texas. On December 17, 1971, the court amended its order so that only one of the four tracts, one of the Austin parcels, would be sold to satisfy the judgment and would be sold in a private sale to the Urban Renewal Agency of the City of Austin for the sum of $85,000 cash pursuant to Title 28, U.S. C., Section 2001.[2]

As required by Section 2001(b), the court appointed three disinterested persons to appraise the property and file their valuations with the court. These appraisals were in the amounts of $105,000, $98,775 and $93,000, an average of $98,925 with $6,075 being the largest deviation. The district court further adhered to the requirements of Section 2001(b) by causing the terms of the proposed private sale to be published in a newspaper of general circulation for ten days along with the conditions for making offers higher than at least ten per cent (10%) over the minimum two-thirds value of the property as determined by the three court-appointed appraisers. A hearing on confirmation of the private sale was held on May 4, 1972, where, in the absence of higher offers, the court confirmed the private sale of the single Austin tract involved to the Urban Renewal Agency of Austin for $85,000 in cash. With the entry of the order for confirmation of sale, orders for partial distribution were filed which satisfied the Government's judgment for federal income tax liabilities for the relevant years. Certain other claims against defendants-appellants were also satisfied from this source. The instant appeal was taken from the order confirming the sale.

Taxpayer argues that the property involved was worth far more than the $85,000 ultimately paid for it by the Urban Renewal Agency. He further alleges that private investors anxious to develop the property were available and willing to pay as much as $850,000 for the Austin parcel should it become available for purchase without the threat from the United States "or its agent, the Urban Renewal Agency of Austin",

2. Title 28, U.S.C., Section 2001: Sale of Realty Generally:

(a) Any realty or interest therein sold under any order or decree of any court of the United States shall be sold as a whole or in separate parcels at public sale at the courthouse of the county, parish, or city in which the greater part of the property is located, or upon the premises or some parcel thereof located therein, as the court directs. Such sale shall be upon such terms and conditions as the court directs.

Property in the possession of a receiver or receivers appointed by one or more district courts shall be sold at public sale in the district wherein any such receiver was first appointed, at the courthouse of the county, parish, or city situated therein in which the greater part of the property in such district is located, or on the premises or some parcel thereof located in such county, parish, or city, as such court directs, unless the court orders the sale of the property or one or more parcels thereof in one or more ancillary districts.

(b) After a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs, the court may order the sale of such realty or interest or any part thereof at private sale for cash or other consideration and upon such terms and conditions as the court approves, if it finds that the best interests of the estate will be conserved thereby. Before confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities. No private sale shall be confirmed at a price less than two-thirds of the appraised value. Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation. The private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale.

(c) This section shall not apply to sales and proceedings under Title 11 or by receivers or conservators of banks appointed by the Comptroller of the Currency.

to condemn it under the "Appellee's Powers of Eminent Domain." In addition to having his property taken without receiving Fifth Amendment "just compensation," the Taxpayer asserts that since the United States currently claims more than $600,000 for alleged tax liabilities for the years 1961 through 1969, the tax debt will remain as an eternal burden upon him and his wife in spite of the foreclosure of their property, thus denying them the due process of law also guaranteed by the Fifth Amendment. In short, the Taxpayer envisages some sinister, concerted effort between the United States and the Urban Renewal Agency of Austin working to deprive him of his property and relegate him to a permanent status of debtor. The outrage of this conspiracy, he urges, is intensified by the existence of prospective purchasers and investors who could and would purchase the property for a sum sufficient to satisfy all of their obligations if only the property were safely immunized from the threat of condemnation by "eminent domain" with which it is now plagued. Accordingly, he seeks an order providing that the property be sold at public auction to the highest bidder, "with all bidders secure in the knowledge that they are protected from Appellee's powers under the Doctrine of Emminent (sic) Domain, that should the property be acquired by condemnation under that Doctrine, that the purchaser will be reimbursed the full amount paid plus a reasonable profit thereon."

■ Of course, the United States has not attempted to exercise its power of eminent domain over the subject property. It merely seeks to be compensated by the Taxpayer for the tax liabilities already adjudged to be due and owing.

The United States has simply elected to obtain that satisfaction by a judicial sale of defendants-appellants' property pursuant to Title 28, Section 2001. This being so, the identity of the prospective purchaser is an irrelevancy.[3]

■■ The district court scrupulously adhered to the statutory requirements of Title 28, U.S.C. Section 2001 for a judicial sale of realty. That court acted well within its discretionary bounds in approving the sale for $85,000, about 86% of the average appraisal figure, and approximately 80% of the highest appraisal figure, $105,000. The three disinterested court-appointed appraisers determined the property to be worth an average of $98,925. No other offers were forthcoming in response to the advertisement for bids, leaving the strong presumption that $98,925 represented the approximate market value.

The Taxpayer's allegation that purchasers existed who were willing to refute the appraisal figures with a bona fide offer is completely unsupported. We refuse to find that the property was sold for a grossly inadequate price on a record which is convincingly to the contrary. See Weir v. United States, 8 Cir. 1964, 339 F.2d 82, 87; and American Trading & Production Corp. v. Connor, 4 Cir. 1940, 109 F.2d 871, 872 and 874.

■ The Taxpayer's request that we, somehow, enjoin the state from exercising its sovereign power of eminent domain is supported by no authority whatsoever. And, as already noted, the private sale under Section 2001 does not involve the power of eminent domain in any sense. Western v. McGehee, D.Md. 1962, 202 F.Supp. 287, 293.

■ The Taxpayer also questions the district court's decision to sell only one

---

3. Whether the Urban Renewal Agency of Austin did intend to exercise its power of eminent domain if, indeed, it is so endowed, is of no moment here. Clearly, the Urban Renewal Agency is a creature of state statute, 2B Vernon's Tex.Civil Stat.Ann., Art. 1269*l*–3. The state, by virtue of its sovereignty, has the right to reassert, either temporarily or permanently, its dominion over any portion of the soil of the state on account of public exigency and for the public good. When and where the sovereign has exercised that power, it is against the source of that power at that time that any challenge to eminent domain must be asserted.

of the four properties at a private sale and leave the other three to be sold at a public auction should the need arise if subsequent liens against them are perfected. Here again, he fails to demonstrate any abuse of discretion by the district court in setting the terms and conditions of the judicial sale. United States v. Branch Coal Corp., 3 Cir. 1968, 390 F.2d 7, 10; and cases there cited.

Affirmed. ·