JOHN A. GARCIA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Garcia v. Commissioner
Docket No. 10482-86.
United States Tax Court
T.C. Memo 1989-106; 1989 Tax Ct. Memo LEXIS 106; 56 T.C.M. (CCH) 1457; T.C.M. (RIA) 89106; March 16, 1989. John A. Garcia, pro se. James W. Lessis, for the respondent. MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax in his notice of deficiency dated January 27, 1986 as follows: Additions to Tax Under Sections [1]
Year
Deficiency
6653(b)
6653(b)(1)
6653(b)(2)
6661
1975
$ 77,934.39
$ 38,967.19
1976
82,953.37
41,476.69
1977
99,348.67
49,674.34
1978
83,984.05
41,992.03
1982
85,245.74
$ 42,622.87 *        $ 8,524.57
1983
51,163.67
25,581.84 *        5,116.37
*109 In his Answer, respondent asserted as an alternative position for any of the years in which we decide the fraud addition is inapplicable that: (1) petitioner is liable for additions to tax under section 6651(a)(1) for the years 1976-1978 and 1982-1983; and (2) petitioner is liable for additions to tax under section 6653(a) for the years 1975-1978 and under section 6653(a)(1) and (2) for the years 1982-1983. Petitioner then raised the statute of limitations as an affirmative defense. We dismiss sua sponte respondent's alternative positions as pertains to the years 1975-1978, since a decision that fraud does not exist would bar assessment under section 6501. In his Amendment to Answer, respondent asserted that the correct rate to apply in computing the additions to tax under section 6661 was 25 percent, rather than the 10 percent rate utilized in respondent's *110 notice of deficiency. After a concession by respondent, [2] the issues for decision are: (1) whether petitioner is entitled to certain claimed deductions, disallowed by respondent, on his Forms 1040 [3] filed for each year at issue; (2) whether petitioner is liable for additions to tax for fraud for each year at issue, or, in the alternative, for additions to tax for negligence and for failure to file returns for 1982 and 1983; (3) whether the statute of limitations bars the assessment of tax for the years 1975-1978; and (4) whether petitioner is liable for the substantial understatement addition to income tax under section 6661 for 1982 and 1983, and if so, what is the correct rate to be applied in computing the addition. *111 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition in this case was filed, petitioner resided at the Federal Correctional Institution in Fort Worth, Texas. Petitioner was a calendar year taxpayer and timely filed his Federal income tax return (return) for 1975. His 1976, 1977 and 1978 returns were filed on June 6, 1977, June 7, 1978, and June 28, 1979, respectively. Petitioner submitted Forms 1040 with schedules for 1982 and 1983 on July 21, 1983 and May 16, 1984, respectively. All filings and submissions were with the Internal Revenue Service Center at Austin, Texas (Austin). Petitioner holds a bachelor's degree from the University of Texas and was conferred a medical degree from Tulane University in 1942. After his release from the U.S. Army, he commenced the private practice of medicine in Austin in 1945 or 1946. Due to continued problems with the Internal Revenue Service (IRS), petitioner attended law school at the University of Texas on a part-time basis from 1953 to 1960, but never received a degree. In law school, he completed *112 courses in Federal taxation and legal accounting. Petitioner's battles with Federal taxing authorities span four decades. Petitioner and his wife, Mary Sue Garcia, were assessed Federal income tax liabilities at various times for the years 1954 through 1961, but excluding 1957, in the total amount of $ 109,583.43. In 1965, the United States filed suit in United States District Court against petitioner in order to reduce uncollected assessments of $ 85,574.31 (plus interest) to judgment and to foreclose tax liens on various parcels of real estate. In reaching its decision, the District Court set aside certain real estate transactions by petitioner and his wife, thereby subjecting such properties to tax lien and foreclosure. United States v. John A. Garcia, Civil Action No. 1585 (W.D. Tex., Austin Div., July 28, 1967). One of the properties involved was located on Sabine Street in Austin (Sabine Street Property). In August of 1959, petitioner and his wife executed a document purporting to create the "Garcia Educational Trust" (Trust) for the benefit of their minor children. The Trust purchased the Sabine Street Property for $ 14,500 and then rented space to petitioner and *113 other doctors for operation of the "Garcia Clinic." The District Court held that a valid trust was not created but the arrangement was merely one of agency, so that the real estate allegedly owned by the Trust in fact belonged to petitioner and his wife. The District Court decision was affirmed on appeal. Garcia v. United States,421 F.2d 1231 (5th Cir. 1970), cert. denied 400 U.S. 945 (1970). On October 15, 1971, the District Court granted the Government's request for the public sale of four parcels of land owned by petitioner. On December 17, 1971, the Court amended its order to provide that the Sabine Street Property would be sold in a private sale to the Urban Renewal Agency of the City of Austin for the sum of $ 85,000 cash. The court appointed three disinterested persons to appraise the property and file their valuations with the court. These appraisals were in the amounts of $ 105,000, $ 98,775 and $ 93,000, or an average of $ 98,925. On May 4, 1972, a hearing on confirmation of the private sale was held and, in the absence of higher offers, the court confirmed the sale for $ 85,000. Petitioner again appealed. United States v. Garcia,474 F.2d 1202 (5th Cir. 1973). *114 On appeal he alleged that private investors were available who were willing to pay as much as $ 850,000 for the Sabine Street Property, were it not for the threat of condemnation by eminent domain by the United States or the Urban Renewal Agency of Austin. Petitioner argued that the property was taken without receiving Fifth Amendment "just compensation." 474 F.2d at 1204-1205. The Court of Appeals held, inter alia, that the United States had not attempted to exercise its power of eminent domain over the property, but merely properly sought to be compensated for tax liabilities already adjudged to be due and owing. The Court of Appeals also found petitioner's allegation that purchasers existed who were willing to refute the appraisal figures with a bona fide offer was completely unsupported. 474 F.2d at 1205. Indeed, petitioner testified to this Court that he computed the $ 850,000 figure merely by adding projected rental revenues over approximately a 15-year period, and could not remember the names of persons willing to bid this amount, except for an individual who is now dead. Petitioner considered the invalidation of the Trust to be, in effect, a *115 "gift" of the Sabine Street Property to him. On a depreciation schedule attached to his 1967 joint return, petitioner claimed a $ 20,000 deduction for the Sabine Street Property, with the following explanation on such schedule: The above property currently is involved in litigation in the Federal District and Appeal courts of the United States Judiciary System. In May, 1967, Judgement was rendered in the United States District Court for the Western District of Texas in Civil Suit No. 1585 styled United States of America vs. John A. Garcia et at [sic], which judgement held that the above property is owned by John A. Garcia. For this reason, this property appraised at 100,000.00 [dollars] is currently being depreciated at the rate of a life of five years since this property is in an area of urban renewal and it is anticipated that if such property rights continue in us [sic] on appeal, such rights will have less than 5 years of expectancy. The depreciation schedule also stated that the cost of the Sabine Street Property was "unknown", and that no depreciation had been claimed in prior years. The $ 100,000 figure represented the building portion of the $ 850,000 value placed *116 on the Sabine Street Property by petitioner. Even though the $ 20,000 was claimed as depreciation, petitioner testified that his legal theory for the deduction was that he thought there was an Internal Revenue Code (Code) provision supporting a five-year capital loss carryover in these circumstances. On his 1971 joint return, petitioner deducted $ 20,000 of depreciation based upon an explanation similar to that stated on his 1967 joint return. In addition, petitioner claimed $ 15,000 of depreciation related to "furniture and equipment", after ascribing a $ 100,000 value also to it. On his 1973 joint return, petitioner again claimed the $ 20,000 and $ 15,000 depreciation deductions discussed above. His wife, Mary Sue Garcia, signed the return with the following typed in qualification: "I do not assume responsibility for the accuracy or correctness of this report as I was refused access to the records from which it was prepared, nor do I know by whom it was prepared." Petitioner also claimed $ 75,000 deduction described as a "Loss due to forced sale of land & Buildings to Urban Renewal of Austin to be amortized over 10 years (total loss 750,000.00)." A $ 75,000 deduction was *117 similarly claimed on petitioner's 1975 return with the following additional explanation: Property at * * * Sabine Street, Austin, Texas, was involved in litigation in the United States Courts. Judgement was rendered in May 1967 in the United States District Court for the Western District of Texas in Civil cause # 1585 styled United States of America vs John A. Garcia et al holding that said property was the property of John A. Garcia. Land was appraised at 750,000.00 [dollars], and the replacement value of the buildings was at plus $ 100,000.00. The property was ordered sold to the highest bidder at the courthouse steps in the original judgement. This sale to the highest bidder was denied, and the property was sold at private sale to the Urban Renewal Agency of Austin in May 1973 for a sum less than one tenth of the apprasided [sic] value. Appeal of the sale in the Courts was thwarted by lack of legal expertise and funds and the loss from that forced sale is being taken over the next ten years in the preparation of our adjudted [sic] gross income. On his 1976, 1977 and 1978 returns, and on the submissions on Form 1040 for 1982 and 1983, petitioner included a similar *118 explanation for $ 75,000 deductions claimed in each of such years. Petitioner could not point to any specific legal authority for the loss deductions. However, he did advance various theories, including: (1) that the $ 75,000 deduction was analogous to income averaging; (2) that he chose an "arbitrary figure of ten years" so that a "large loss such as this could be amortized"; (3) that it would be " a little foolhardy" to claim the entire loss in the first year; (4) that he recalled from one of his law school courses that a capital loss carryover was permitted; and (5) that he did not rely on any particular provision of the Code in claiming the loss, because he felt that the "Internal Revenue [Service] would be able to * * * determine for itself under which Section this [i.e. the loss] went." Petitioner did not seek the advice of an accountant, lawyer or other tax professional as to the tax treatment of this or any other item, and he prepared all returns and submissions entirely himself. In contrast, petitioner had deducted a loss on his 1965 return on the foreclosure sale of certain property located at North Loop and Evans in Austin (North Loop & Evans Property). Petitioner *119 then computed the loss of $ 4,045.30 by subtracting the cost of the property ($ 5,750.00) from the foreclosure sale proceeds ($ 1,704.70). Petitioner did not explain why he used two different methods in computing the losses on the North Loop & Evans Property and the Sabine Street Property. On April 12, 1982, petitioner was indicted on two counts of willfully filing false Federal income tax returns under section 7206(1) for the calendar years 1975 and 1976. The indictment specified that petitioner reported the following items as deductions, well knowing and believing that he had incurred substantially smaller deductions: Item
1975
1976
Auto leasing and rentals
$ 12,300.00
$ 12,300.00
Travel, hotel and airlines
15,834.72
21,177.37
Telephone and exchange
10,823.00
15,472.18
Insurance
2,470.00
13,970.00
Loss due to forced sale of
land and buildings to Urban
Renewal of Austin [i.e. Sabine
Street Property]
75,000.00
75,000.00
Petitioner entered a plea of not-guilty to the indictment. After a jury trial on the merits, petitioner was found guilty of both counts in the indictment. On February 17, 1984, petitioner was sentenced to four years *120 imprisonment and fined $ 10,000. Petitioner's conviction was later affirmed on appeal. United States v. John A. Garcia, Case No. A-82-CR-052 (W.D. Tex., Austin Div., 1984), affd. 762 F.2d 1222 (5th Cir. 1985), cert. denied 474 U.S. 907 (1985). Shortly after the indictment, petitioner was interviewed by a reporter named Abby Kaighin, who later authored a newspaper article which appeared on the front-page of the June 20, 1982 edition of the Austin American-Statesman entitled "Doctor diagnoses reasons for $ 1 million tax bill." Abby Kaighin later testified at petitioner's criminal tax trial on January 9, 1984. At trial, we reserved ruling on the admissability of the newspaper article. Accordingly, we now digress from our findings of fact to consider this evidentiary issue. The stipulation of facts signed by the parties on May 27, 1987, provides in pertinent part: It is hereby stipulated that, for the purposes of this case, the following statements may be accepted as facts and all exhibits referred to herein and attached hereto may be accepted as authentic and are incorporated in this stipulation and made a part hereof, provided, however, that either *121 party has the right to object to the admission of any such facts and exhibits in evidence on the grounds of relevancy and materiality, but not on other grounds unless expressly reserved herein, and provided, further, that either party may introduce other and further evidence not inconsistent with the facts herein stipulated. * * * 60. Attached as Exhibit 57-BE (Depo-23) is a copy of a newspaper article authored by Abby Kaighin which appeared in the Austin American-Statesman on June 20, 1982. Petitioner disputes some of the statements made in this article as indicated in petitioner's deposition (Exhibit 1-A) at pages 59 to 73. Petitioner reserves the right of further comment to Exhibit 57-BE at trial.
61. Attached as Exhibit 58-BF (Depo-35) is the excerpt from the petitioner's criminal tax trial of Abby Kaighin's testimony on January 9, 1984. Petitioner disputes some of the statements made during Abby Kaighin's testimony as indicated in petitioner's deposition (Exhibit 1-A) at pages 84 to 87. Petitioner reserves the right of further comment to Exhibit 58-BF at trial.
* * * [Emphasis added.] At trial, petitioner raised a hearsay objection as follows: "We *122 do object to the article being introduced, inasmuch as the writer of this article is not here for cross-examination." (Petitioner habitually refers to himself as "we".) Certain of the statements made by petitioner to Abby Kaighin during the interview constitute non-hearsay admissions by a party-opponent, admissible under Fed. R. Evid. 801(d)(2). However, the admissions were not offered by Abby Kaighin's live, in-court testimony, but rather through a newspaper article which constitutes inadmissable hearsay. Fed. R. Evid. 801(c). The issue before us is whether petitioner waived his hearsay objection to the newspaper article by stipulation. Generally, a stipulation of facts is controlling on the parties, and the Court is bound to enforce it. Stamos v. Commissioner,87 T.C. 1451, 1454 (1986); Rule 91(e). Rule 91(e) provides in relevant part: (e) Binding Effect: A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by the parties. The Court will *123 not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires. * * * Stipulations on legal issues such as the admissability of evidence, however, are uniquely within the province of the Court to determine and are not binding on the Court. Stamos v. Commissioner, supra at 1455, citing King v. United States,641 F.2d 253, 258 (5th Cir. 1981), and United States v. Waterman S.S. Corp.,397 F.2d 577, 579 (5th Cir. 1968). Stipulations, like contracts, bind parties only to the terms actually agreed upon. Stamos v. Commissioner, supra, citing United States v. McKinney,758 F.2d 1036, 1047 (5th Cir. 1985), and Rice v. Glad Hands, Inc.,750 F.2d 434, 438 (5th Cir. 1985). The interpretation of a stipulation primarily is determined by ascertaining the intent of the parties, and such intent is a question of fact. Stamos v. Commissioner, supra.
We conclude that petitioner stipulated away his hearsay objection to the newspaper article. Had petitioner reserved a hearsay objection *124 in the stipulation of facts, respondent could have instead called Abby Kaighin to testify at trial. We also see no unfairness to petitioner by enforcing the stipulation of facts. In the stipulation, petitioner reserved comment on particular statements purportedly made by him in the newspaper article, and by Abby Kaighin at his earlier criminal trial. At trial, petitioner exercised his right to controvert this evidence, and we are satisfied that such opportunity was sufficient. We also note that petitioner did not object at trial to the introduction of the prior testimony of Abby Kaighin at his earlier criminal trial, thereby waiving any objection he may have had. Since there is significant overlap between the content of the article and Abby Kaighin's prior testimony, the effect of a hearsay objection to the article would be rendered partially moot. Accordingly, we admit the newspaper article into evidence, giving it the limited weight and credibility we think it deserves. Petitioner was questioned at trial regarding particular excerpts of the newspaper article. First, petitioner was asked about an excerpt providing that "He said he owes nothing [i.e. no taxes] because all *125 of his expenditures are business expenses, leaving him no net income." At trial, petitioner essentially denied deducting personal expenses through the Garcia Clinic. The parties stipulated to the admission of a pre-trial deposition taken of petitioner on April 27, 1987 (Deposition). This Deposition is more revealing: Q: * * * Did you make the statement that you don't owe anything in terms of federal income taxes because all of your expenses are business expenses? A: No. * * * [W]hat we said was that all the * * * expenses [of] the clinic were business expenses * * *. * * * Q: And your food and rent and uniforms were clinic expenses; therefore, they were deductible business expenses? * * * A: They were deductible to the clinic as an expenses [sic]. In other words, we * * * were working for the clinic in exchange for our sustenance. In other words, for them taking care of our necessary everyday expenses. Q: Could you give an example of that in tangible terms [?] * * * A: Well, they paid my rent at * * * my apartment. The rent was $ 350.00 a month. And the * * * clinic paid for my lunch and * * * paid for my gasoline. Second, petitioner was asked about *126 statements in the article that he gave away his assets in a deliberate attempt to make himself judgment-proof. Petitioner's response was limited to commenting on one particular property conveyance challenged as invalid by the government which was later seized and sold. Third, petitioner was asked about an excerpt providing: "If Garcia wins his case, his 30-year plan is vindicated. If convicted and imprisoned for filing false income tax returns, the Federal government will be offering him permanent luxurious retirement." Petitioner explained, but did not deny the thrust of this statement. Finally, petitioner was asked about an excerpt providing: "Garcia compared battling the IRS with playing tennis. 'The fun is not whether you win or lose. The fun is playing.'" Petitioner admits that he plays tennis, but claims that what he meant to say was that all of life is a game. Respondent's notice of deficiency disallowed business expenses claimed by petitioner on his returns filed for the years 1975 through 1978, as follows: 1975
1976
Auto Rentals and Leasing
$ 11,880.00 $ 11,625.00
Gas and Oil
14,059.75 9,255.54
Insurance Expense
2,392.00 13,700.00
Auto Repairs and Maintenance
1,056.95 2,728.19
Rentals
(2,082.46)
4,634.69
Dues and Contributions
610.00 605.00
Laboratory
390.00 448.06
Legal and Accounting
650.00 650.00
Maintenance and Repairs
790.77 1,157.45
Laundry
480.03 552.97
Stationery and Stamps
4,385.45 7,170.73
Telephone and Exchange
7,348.53 11,742.62
Office Expense
10,590.54 13,960.24
Miscellaneous Losses
20,000.00 20,000.00
Interest to Banks & Others
1,567.22 3,754.71
Fee to others and refunds
867.00 1,101.00
Travel Hotels and Airlines
15,834.72 21,177.37
Loss due to forced sale
75,000.00 75,000.00
Dues and Contributions
Mathematical Errors on Return
Total
$ 165,820.50 $ 199,263.57
*127 1977
1978
Auto Rentals and Leasing
$ 12,300.00
$ 11,400.00
Gas and Oil
11,640.00
6,480.00
Insurance Expense
14,500.00
14,500.00
Auto Repairs and Maintenance
3,472.49
802.48
Rentals
19,287.35
19,827.35
Dues and Contributions
Laboratory
455.00
680.00
Legal and Accounting
470.00
Maintenance and Repairs
1,485.49
845.00
Laundry
925.00
1,275.00
Stationery and Stamps
10,847.42
4,478.84
Telephone and Exchange
15,672.31
7,574.67
Office Expense
18,742.43
8,574.54
Miscellaneous Losses
20,000.00
20,000.00
Interest to Banks & Others
4,250.00
Fee to others and refunds
1,255.00
Travel Hotels and Airlines
26,586.64
16,897.72
Loss due to forced sale
75,000.00
75,000.00
Dues and Contributions
640.00
640.00
Mathematical Errors on Return
10,010.00
Total
$ 247,539.13
$ 188,975.60
Respondent disallowed all business expense deductions claimed by petitioner for the year 1982. On his Form 1040 submitted to respondent, petitioner typed in "Net Income" of zero on line 7, reserved for wages, salaries, tips, etc. On Schedule C, petitioner listed business income totalling $ 182,796.68, and claimed a total business expense deduction *128 of equal amount. He did not detail these expenses on the schedule, but rather placed asterisks on each line, referencing to the following note: This taxpayer's tax return has been audited yearly since 1960. The results of the Internal Revenue Service audit have never come to the same figures and conclusions which this taxpayer recorded. For this reason the detailed amounts of the deductions and expenditures in the categories noted bye [sic] the asterisk (*) can be secured by the agent who will audit this return. Like 1982, petitioner's 1983 Form 1040 showed "Net income" of zero on line 7. On Schedule C, petitioner listed business income totalling $ 117,705.43. However, unlike 1982, his 1983 Schedule C did not show a total for business expenses. Rather, petitioner placed an asterisk on the line reserved for "Total deductions", as well on all other pertinent lines reserved for detailing specific deductions. The asterisks referred to an explanation similar to the one submitted with his 1982 Form 1040. By claiming zero net income, we assume that petitioner intended to deduct business expenses equalling his business income. However, respondent's notice of deficiency did not *129 disallow deductions, but rather stated that gross income of $ 117,705.43 had been excluded from petitioner's 1983 Form 1040. In this case, respondent's differing treatment of 1982 and 1983 in his notice of deficiency has no effect on our decision. Petitioner signed both his 1982 and 1983 Forms 1040. He dated both forms for their respective April 15th due dates, even though they were not received by respondent until months later. Petitioner also checked exemption boxes on both his 1982 and 1983 Forms 1040 claiming that he was blind. He was not blind during these years. However, since petitioner simply claimed that his net income on both Forms 1040 was zero, the claimed exemptions for blindness never actually resulted in any claimed deduction. As a final matter, we repeat certain comments made by petitioner at his pre-trial Deposition. When asked his feelings about the Internal Revenue laws and their administration, petitioner responded: A: * * * The way that I felt was * * * that the whole Internal Revenue Code * * * is probably the basis for most of our social ills because it encourages lying and cheating and stealing particularly from our government. * * * I think that *130 * * * the code was wrong [and] that's why I was gratified by the [recent] change[s]. I think it was wrong because it didn't * * * conform to the constitutional requirements that * * * the government have a tax assessor and a tax collector. * * * I felt that the * * * idea of making every individual his own tax assessor * * * was built in trouble because people lie and cheat, we all do. (Pause.) It's always in our favor, unfortunately. * * * Q: You harbor no ill feelings to anyone in the Internal Revenue [Service?] A: Oh, heavenly days, no. No. I always felt the IRS was doing their job. * * * [T]he only thing I resented was the fact that they didn't come after me thirty years ago when I started this foolishness. I'd quit it. I really would of, cause it * * * was obstinacy and * * * hardheadedness and so forth. And I think if somebody had just taken a two by four and hit me on the head to get my attention that I'd quit. OPINION The first issue for decision is whether petitioner is entitled to business expense deductions disallowed by respondent for the years at issue in this case. Deductions are a matter of legislative grace and entitlement thereto must be *131 shown by the taxpayer. New Colonial Ice Company v. Helvering,292 U.S. 435 (1934). The determinations of the Commissioner are presumptively correct, and the taxpayer bears the burden of proving that such determinations are in error. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Petitioner offered no evidence to substantiate his entitlement to claimed deductions disallowed by respondent. Indeed, petitioner concedes this point on brief. [4] In 1982 and 1983, petitioner claimed a total amount of business deductions equal to reported gross income, which respondent disallowed entirely. While it is possible that petitioner may be entitled to some business deductions in 1982 and 1983, the record affords us no basis for estimating any such deductible amounts under Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Accordingly, we are impelled to uphold respondent's determined deficiencies as correct. *132 The second issue for decision is whether petitioner is liable for additions to tax due to fraud for each of the years 1975-1978 and 1982-1983. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). Fraud is never presumed, but rather must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Respondent may not rely solely on petitioner's failure to carry his burden of proof as to the underlying deficiencies. Habersham-Bey v. Commissioner,78 T.C. 304, 311-312 (1982). *133 However, fraud may be proved by circumstantial evidence, since direct proof of a taxpayer's intent is rarely available. Spies v. United States,317 U.S. 492 (1943); Stone v. Commissioner,56 T.C. 213, 223-224 (1971). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). We begin by considering the effect of respondent's concession reproduced in footnote 2, supra. Respondent concedes that, with respect to the section 6653(b)(2) addition for 1982 and 1983, only the underpayment of tax related to $ 75,000 "loss" deductions claimed in both years by petitioner shall be considered attributable to fraud. [5]
The section 6653(b) addition to tax due to fraud applicable to 1982 and 1983 contains two *134 segments. Section 6653(b)(1) provides for an addition equal to 50 percent of the underpayment of tax if "any part" of such underpayment is due to fraud. Respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment for each of the years at issue is attributable to fraud. Lee v. United States,466 F.2d 11, 16-17 (5th Cir. 1972). Section 6653(b)(2) provides for an addition equal to 50 percent of the interest payable under section 6601 "with respect to the portion of the underpayment described in [section 6653(b)(1)] * * * which is attributable to fraud." Unlike section 6653(b)(1), section 6653(b)(2) requires that the portion of an underpayment attributable to fraud be established. Accordingly, the effect of respondent's concession is to limit our inquiry as to 1982 and 1983 on the fraud issue to deciding whether petitioner fraudulently deducted the $ 75,000 "loss" items. Petitioner was convicted on two counts of willfully filing false Federal income tax returns under section 7206(1)[6] for the calendar years 1975 and 1976. This conviction was affirmed in United States v. John A. Garcia,762 F.2d 1222 (5th Cir. 1985), *135 cert. denied 474 U.S. 907 (1985). Since the specific intent to evade taxes is not an element of the crime charged under section 7206(1), a conviction thereunder does not establish as a matter of law a taxpayer's liability for the fraud addition under section 6653(b). Wright v. Commissioner,84 T.C. 636, 643 (1985). While petitioner is not collaterally estopped from denying liability for the fraud addition, this Court has concluded that a conviction under section 7206(1) is evidence of fraudulent intent. Wright v. Commissioner, supra at 643-644. Further, petitioner is collaterally estopped from denying that he willfully filed false returns for 1975 and 1976 by reporting deductions listed in the indictment well knowing and believing that he had incurred substantially smaller deductions. Whyte v. Commissioner,T.C. Memo. 1986-486, citing Wright v. Commissioner, supra.
*136 One such deduction listed in both counts of the indictment was the $ 75,000 "loss" deduction claimed by petitioner related to the sale by court order of the Sabine Street Property. Petitioner "amortized" a $ 750,000 figure which he considered to be the Sabine Street Property's land value on a straight-line basis over a 10-year period. He claimed a similar deduction in each of the other years at issue herein. We next consider whether the deduction of this item each year by petitioner constituted fraud within the meaning of section 6653(b). The wrinkle in this case is that petitioner filed a lengthy explanation of the basis for the $ 75,000 deduction each year. Respondent points to the falsity of the statements made in the explanations, including: (1) the omission of the Sabine Street Property's adjusted basis; (2) the omission of information regarding the court ordered appraisals of the property; and (3) the misrepresentation that the property had been "appraised" at $ 850,000, while this figure was merely an unsupported value assigned to the property by petitioner. We agree that these statements and omissions were false. However, a simple reading of the explanation alerts *137 the reader that the deduction is without any valid legal support, notwithstanding its factual falsity. Section 165(a) allows a deduction for any loss sustained during the taxable year which is not compensated for by insurance or otherwise. Section 165(b) provides generally that the amount of the deductible loss is measured by reference to the adjusted basis of the concerned property under section 1011. In this case, petitioner's cost of the Sabine Street Property was $ 14,500 and the sale proceeds were $ 85,000. Consequently, petitioner obviously did not suffer a deductible loss. In Jacobs v. Commissioner,T.C. Memo. 1977-1, the taxpayer twice reported a "theft loss" from what she believed to be an illegal condemnation. Like petitioner, she computed the "theft loss" based upon a value she assigned to the property, rather than properly computing gain or loss based upon the difference between the amount realized and the adjusted basis. On the taxpayer's returns for both 1972 and 1973 the alleged theft losses claimed were clearly identified. With her 1972 return the taxpayer attached a separate sheet on which said losses were described and the amounts thereof *138 computed. With her 1973 return the taxpayer attached a letter to the Commissioner in which she directed his attention to the theft losses and essentially requested that she be audited with respect thereto. In the case at bar, petitioner similarly attached an explanation for his claimed losses each year. Also, with respect to the years 1982 and 1983, petitioner did not detail his deductions claimed and instead attached a statement that he had been audited every year since 1960 and that the IRS agent to be assigned to audit his 1982 and 1983 returns could secure necessary information at such time. We held in Jacobs that even though the taxpayer knew she was not entitled to the "theft losses", she did not make such excessive claims with the intent to defraud the Government by calculated tax evasion. We concluded that the reported losses were not fraudulent, because of our finding that she actually believed her property had been illegally taken and reported an excessive loss in order to have the Commissioner examine the circumstances of the condemnation action. However, we concluded our opinion in Jacobs with the following caveat: At some point in time a refusal to accept *139 determinations made by properly sanctioned authorities, specifically that petitioner's property was not illegally taken, can be objectively viewed in only one way -- that no reasonable person could truly hold a contrary belief and thus that petitioner does not actually believe to the contrary but simply continues to adopt a self-serving position. Under such circumstances a finding of fraud would be justified. See Mitchell v. Commissioner, * * * [118 F.2d 308 (5th Cir. 1941), revg. and remanding 40 B.T.A. 424 (1939), supp. opinion 45 B.T.A. 822 (1941).] [36 T.C.M. 1, 6; 46 P-H Memo T.C. par. 77,001, at 6.] We do not doubt that petitioner believed he was wronged by the ordered sale of the Sabine Street Property at a price he thought was too low. However, after pursuing fruitless litigation regarding the value of the property, the sale price was affirmed on appeal in 1973. United States v. Garcia,474 F.2d 1202 (5th Cir. 1973). In the face of this final decision, petitioner continued to maintain that the property's value was ten times higher than the sales price and so he "amortized" *140 his value of the land over ten years. Unlike the taxpayer in Jacobs, we do not believe that petitioner deducted the $ 75,000 "losses" solely as a means to redress the forced sale of his property. Petitioner mentioned a number of confused legal theories which he thought could support the claimed losses, but could not point to any specific authority. Further, on his 1965 joint return petitioner computed a loss on the sale of the North Loop & Evans Property by subtracting the cost of the property from the foreclosure sale proceeds. Petitioner was unable to explain his disparate tax treatment of the North Loop & Evans Property and the Sabine Street Property sales. The reason is that petitioner was merely result oriented: he calculated the tax effect of property sales in such a way as to achieve the greatest loss, regardless of what the law may state. Accordingly, petitioner was not merely negligent. Rather, he continued to maintain his self-serving position merely as a facade to cover up what was basically a protest against government authorities and an unwillingness to pay taxes. Petitioner's vocation was that of a medical doctor. He attended law school part-time, completing *141 courses in Federal taxation and legal accounting, to better prepare himself for his encounters with the IRS and to assist him in planning his tax evasion schemes. His ill-fated scheming revolved around the theme that he was a "pauper". First, petitioner would claim non-deductible expenses and losses in order to report no tax liability. In addition to the "losses" on the Sabine Street Property, petitioner deducted substantial amounts of personal expenses as business expenses of the Garcia Clinic; doing so under the guise that he was merely working in exchange for his "sustenance". However, he failed to report the value of these benefits as wages or other income. Second, he would attempt to transfer away his assets in order to make himself judgment-proof. He carried out his plan in spite of the fact that he was continuously under investigation by the IRS, making it highly improbable that he would succeed. [7] We attribute this to petitioner's self-proclaimed "hardheadedness" and an unwillingness to pay taxes. *142 Accordingly, we hold that respondent has clearly and convincingly established that some part of the underpayment during each year at issue was due to fraud. Also, as to the section 6653(b)(2) addition for 1982 and 1983, we hold that the portion of the underpayment related to the $ 75,000 claimed "loss" deductions was attributable to fraud. Since we hold that the section 6653(b) additions apply, we need not consider respondent's alternative position regarding the applicability of additions under section 6651(a)(1) and section 6653(a)(1) and (2). [8]
The third issue for decision is whether the statute of limitations under section 6501 bars the assessment of tax for any of the years at issue. Section 6501(a) provides generally that "the amount of any tax imposed * * * shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without *143 assessment for the collection of such tax shall be begun after the expiration of such period." Under section 6503(a)(1), the running of the period of limitations under section 6501 is suspended, where a timely notice of deficiency is mailed and a timely petition is filed, until 60 days after the decision of this Court becomes final. However, in the case of fraud the tax may be assessed at any time. Sec. 6501(c)(1); sec. 6501(c)(2). Respondent received petitioner's Forms 1040 for the calendar years 1982 and 1983 on July 21, 1983 and May 16, 1984, respectively. Respondent's notice of deficiency covering all the years at issue was dated January 27, 1986. Thus, even in the absence of fraud, respondent's notice of deficiency would be timely as to the years 1982 and 1983. However, we held, supra, that petitioner is liable for additions to tax due to fraud for all years at issue herein. Accordingly, we hold further that the statute of limitations does not bar assessment by respondent. The final issue for decision is whether petitioner is liable for the addition to tax under section 6661 for 1982 and 1983, and if so, what is the correct rate to apply in computing the addition. *144 Section 6661 imposes an addition to tax equal to a percentage of the amount of any underpayment attributable to a "substantial understatement" of income tax. "Understatement" is defined in section 6661(b)(2) as the excess of the amount required to be shown on the return over the amount of tax actually shown on the return. In this case, there was zero tax shown on the 1982 and 1983 Forms 1040. Thus, the deficiencies of $ 85,245.74 and $ 51,163.67 for 1982 and 1983, respectively, are the amounts of "understatement" for each year, assuming but not deciding that the related Forms 1040 were valid returns. [9]
*145 An understatement is "substantial" when it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Sec. 6661(b)(1). The understatements of $ 85,245.74 and $ 51,163.67 for 1982 and 1983, respectively, are greater than $ 5,000 and are necessarily greater than 10 percent of the tax required to be shown. Therefore, there was a "substantial understatement", within the meaning of section 6661, for both 1982 and 1983. Section 6661(b)(2)(B) provides for a reduction in the amount of understatement attributable to items where there is or was substantial authority for the taxpayer's position, or where there has been adequate disclosure of relevant facts affecting the item's tax treatment. The taxpayer bears the burden of proving the applicability of this provision. Rule 142(a). Our finding of fraud was based in part upon petitioner's failure to substantiate claimed deductions or to point to any valid legal authority supporting them. Further, petitioner's disclosures were willfully false, and hence were not adequate. Accordingly, petitioner can take no comfort *146 in this provision, and we uphold respondent's determination as to the applicability of the section 6661 addition. We must next decide the correct rate to apply in computing the addition under section 6661 for 1982 and 1983. Respondent determined additions in his notice of deficiency, of $ 8,524.57 and $ 5,116.37 for 1982 and 1983, respectively, computed at the rate of 10 percent of the underpayment. In his Amendment to Answer, respondent asserted that the correct rate to apply in computing the addition was 25 percent, not 10 percent. Section 6661(a) was originally added to the Code by section 323(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 613. As it was originally enacted, the section provided for an addition to tax of 10 percent of the amount of any underpayment attributable to a substantial understatement of income tax liability, applicable to returns due after December 31, 1982 (Sec. 323 of the Act, 96 Stat. at 615). In 1986, the Congress passed two acts, each of which amended section 6661(a). The Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, 100 Stat. 2085, was passed by the House of Representatives on September 25, 1986, and *147 by the Senate on September 27, 1986. TRA 86 amended section 6661(a) by striking out "10 percent" and inserting in lieu thereof "20 percent," effective for returns due after December 31, 1986. Sec. 1504, TRA 86, 100 Stat. at 2743. The Omnibus Budget Reconciliation Act of 1986 (OBRA 86), Pub. L. 99-509, 100 Stat. 1874, was passed by both houses of Congress on October 17, 1986. OBRA 86 amended section 6661(a) by using a 25 percent rate, "effective for penalties assessed after the date of the enactment of this Act." Sec. 8002, OBRA 86, 100 Stat. at 1951. OBRA 86 was signed into law on October 21, 1986, and TRA 86 was signed into law on October 22, 1986. Thus, TRA 86 was passed by both houses of Congress before OBRA 86, but OBRA 86 was signed into law one day before TRA 86. At the time post trial briefs were filed in this case, this Court had yet to resolve the question of what rate should apply. However, subsequently, we had occasion to decide that the proper rate of the addition to tax provided by section 6661 is 25 percent on additions assessed after October 21, 1986. Pallottini v. Commissioner,90 T.C. 498 (1988). Respondent's argument correctly foreshadowed *148 our decision on this legal question. We therefore hold that the 25 percent rate applies in this case. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. * 50 percent of the interest payable on the portion of the underpayment attributable to fraud.↩
2. In his post-trial brief, respondent made the following concession: At this juncture respondent has made a minor concession due to the fact that the proof of fraud was largely limited to the single $ 75,000.00 deduction which was common to all of the six years in issue. With respect to the I.R.C. § 6653(b)(2)↩ segment of the civil fraud addition to the taxes for 1982 and 1983, respondent hereby concedes that no amount of the underpayment in excess of the portion related to adjustments of $ 75,000.00 for each of these two latter years is attributable to fraud. 3. Respondent contends that the submissions by petitioner to respondent on Form 1040 for the years 1982 and 1983 do not constitute valid returns.↩
4. Petitioner's opening brief states in relevant part: It is acknowledged that under the statute, deficiency determination [sic] by the Commissioner are presumed to be correct, with the burden of proof as to their incorrectnes [sic] resting upon the taxpayer. Present circumstances of petitioner make that impossible, and the amounts of the deficiencies must remain unchallenged.↩
5. Sec. 6653(b)(2) was added to the Code by the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), applicable with respect to taxes the last day prescribed by law for payment of which is after September 3, 1982. Sec. 325(a), TEFRA, Pub. L. 97-248, 96 Stat. 324, 616-617. Thus, sec. 6653(b)(2)↩ is inapplicable to the years 1975 through 1978.
6. SEC. 7206. FRAUD AND FALSE STATEMENTS. Any person who -- (1) Declaration Under Penalties of Perjury. -- Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under penalties of perjury, and which he does not believe to be true and correct as to every material matter * * * * * * shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $ 5,000 or imprisoned not more than 3 years, or both, together with the costs of prosecution.↩
7. At trial, we asked respondent's counsel and petitioner why the years 1979 through 1981 were not at issue in this case. Respondent's counsel did not have an answer. As to petitioner, the following colloquy transpired: THE COURT: Dr. Garcia, can you tell me what happened to '79, '80, and '81? DR. GARCIA: I imagine the same thing that happened on some other returns; the Service lost them. THE COURT: You just never heard from the Service about those three years? DR. GARCIA: No. There were several of our returns that were lost or burned up in the 1950s, and there were two or three that were lost actually in the early '60s, and then I imagine they have lost again the three that are still missing. * * * Assuming petitioner's statements are correct, while he clearly did not prevail herein, he benefitted as to those years in which the IRS failed to properly retain his returns.↩
8. Further, we need not decide whether the submissions by petitioner to respondent on Form 1040 for the years 1982 and 1983 constituted valid returns.↩
9. Sec. 1.6661-2(d)(2), Income Tax Regs., provides that "If no return was filed for the taxable year * * * the amount of tax shown on the return is considered to be zero." See Woods v. Commissioner,91 T.C. 88, 95 n. 11 (1988). Since petitioner reported zero tax on his 1982 and 1983 Forms 1040, we need not decide whether such forms constituted valid returns. In either case, we would reach the same result in computing the addition under sec. 6661↩.